# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JON MICHAEL SALTZMAN, et al., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 10-3265 |
| | : | |
| TD BANK, N.A., | : | |
| Defendant | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                                                        March 28, 2011

In this diversity case, a Florida couple bring an action against their mortgage lender for fraud in the inducement, breach of contract, and conversion. The lender has filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, I will grant the motion in part and deny it in part.

## I. BACKGROUND[1]

In 1994, Jon and Robin Saltzman purchased a parcel of commercial real estate in Upper Macungie Township, Lehigh County.[2] The property included various commercial buildings. A few years later, the couple moved to Florida and rarely returned to Pennsylvania. In 2006, the Saltzmans began exploring the potential development of the

---

[1] The facts are gleaned from the complaint and the extrinsic documents upon which it is based. See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004). For the purposes of this motion, they are presented in the light most favorable to the plaintiffs, as the non-moving parties, and are accepted as true with all reasonable inferences drawn in their favor.

[2] The amended complaint indicates that the Saltzmans owned the property free and clear of any debt, and valuations prepared by reliable third parties reflected a value of $750,000 as a result of the site improvements and governmental approvals made by the Saltzmans since acquiring the property in 1994. See Am. Compl. ¶ 17.

property and retained the engineering firm of Martin, Bradbury & Griffith to prepare plans. The plans called for the demolition of the existing buildings and the construction of a small retail strip center containing nine commercial units for rent. In September 2007, the Saltzmans retained a commercial realtor, NAI Summit, to advise them on marketing the property. Frank Smith, an equity owner of NAI Summit, began working closely with the Saltzmans advising on the development and use of the property. NAI Summit then appointed licensed realtor Jody King to serve as the professional responsible for fulfilling the provisions of the contract in a reliable and professional manner. Miss King told Mr. Saltzman that she was seeking tenants and looking into financing for the project. Mr. Saltzman indicated that he was satisfied with Wachovia Bank with whom he had done business for over twenty-five years. He had discussed the project with individuals at Wachovia who showed a significant interest to move forward. Miss King, however, told Mr. Saltzman that she had a close relationship with Stephen Patterson, a banking professional at TD Bank, and that TD Bank was aggressively seeking customers and could offer a better loan package than any other competitor.

In early 2008, the Saltzmans were meeting with potential builders to obtain construction estimates for the project. In April 2008, Mr. Patterson advised the Saltzmans that TD Bank could offer a loan for $1.5M which would be a construction loan for one year with no payments due during that year. TD Bank required a payment of $5,000 for investigatory purposes. Mr. Patterson indicated that he was confident the loan would be

approved, and informed the Saltzmans that certain loan-to-value ratios[3] had to be satisfied to have the commercial loan approved.

The professional engineer obtained multiple bids for construction costs in May 2008 which were substantially in excess of the Saltzmans' anticipated costs. Shortly thereafter, the Saltzmans notified Mr. Patterson that the project did not appear to be economically feasible. He also told Mr. Patterson that he was concerned about the rental prices that would be required to meet the costs. Mr. Patterson wanted the project to go forward and convinced Mr. Saltzman that TD Bank would be able to offer the Saltzmans a commercial loan of $2M if, among other things, the appraisals justified the loan-to-ratio value.

After TD Bank's real estate appraisal group obtained an appraisal of the property for "As Is" and "As Per Complete" values, in June of 2008, TD Bank advised the Saltzmans that the appraisal indicated that the loan-to-value ratio would make it impossible for the financing to be approved by TD Bank. Mr. Patterson would not show the appraisal to the Saltzmans. Mr. Saltzman accepted that the project was not economically feasible, decided not to proceed with the project, and asked Mr. Patterson and Miss King to return his initial fees.

Determined not to lose the deal, Mr. Patterson informed the Saltzmans that the

---

[3] Loan-to value ratio is defined as the ratio of the amount of a potential mortgage to the value of the property it is intended to finance, expressed as a percentage. It is used as a way to assess the risk of making a particular mortgage loan. A lower loan-to-value ratio is seen as a lower risk to the lender. See http://financial-dictionary.thefreedictionary.com/loan-to-value+ratio.

appraisal company did not use suitable comparables, and that TD Bank would order a reappraisal using different comparables. The updated appraisal was obtained in July 2008, and indicated new values that satisfied TD Bank's loan-to-value ratios for approving financing in the amount of $2M.

The amended complaint alleges that Mr. Patterson knew that the original appraisal was accurate but in an effort to push the project forward, requested the second appraisal. He knowingly caused the property to be overvalued in order to fit TD Bank's loan-to-value requirement. Mr. Patterson knew or should have known that certain comparables and land values supplied for the second appraisal were inappropriate.[4] Mr. Patterson also allegedly knew, however, that Mr. Saltzman would rely on his advice, and that he could convince Mr. Saltzman that the reappraisal values were accurate even though they were not. Mr. Saltzman did, in fact, rely upon Mr. Patterson's representations, concluding that TD Bank would have better knowledge of the market conditions and would not approve a loan under inappropriate circumstances.

On August 29, 2008, the agreement of the Saltzmans and TD Bank was memorialized by three executed documents: (1) a Construction Loan Agreement; (2) a Construction Loan Note; and (3) an Open End Mortgage and Security Agreement. At the same time, Mr. Saltzman was required to deposit $90K, a debt reserve of six months, into

---

[4] Mr. Saltzman questioned how the second appraisal could show an increased value of the property over a few short weeks. Mr. Patterson responded that the original appraisal included rental values at $16 to $19 per square foot. The second appraisal showed those values at $20 to $22 per square foot.

an account with TD Bank. Construction on the project began shortly after the closing on the loan and by April 2009, the Saltzmans had obtained one tenant at a rate of $21.00 per square foot and had rejected several other tenant offers at $15.00 - $16.00 per square foot. Mr. Saltzman had relied on the communications from Mr. Patterson, Miss King, and NAI Summit that the appropriate rental value for the property was in the $20 to $22 per square foot range. Miss King indicated to Mr. Saltzman that they were not yet able to secure the asking rental price because tenants typically want to see the building completed before they agree to rent.

Because of NAI Summit's failure to find tenants willing to pay the higher rates, Mr. Saltzman hired Dick Adams as a new realtor after NAI Summit's contract expired. Mr. Adams told Mr. Saltzman that nearby properties had been renting at $17.50 per square foot or less for at least the previous three years. This information was directly in conflict with the figures supplied by Mr. Patterson and Miss King. Mr. Adams also indicated that Mr. Saltzman's property would probably generate lower rental values because the other properties renting at $17.50 were at locations superior to Mr. Saltzman's property.

By November 2009, construction at the property was still not complete despite an initial ninety-day extension of the interest-only period. The Saltzmans requested a second extension on the interest-only payment terms from TD Bank, and TD Bank agreed to extend those terms for six months conditioned upon Mr. Saltzman paying a fee of $10K.

By early February 2010, the property still only had one tenant and the Saltzmans requested an additional extension period of the interest-only payment option. TD Bank did not grant such an extension.

Per the agreement, upon completion of construction, the Construction Loan automatically converted to a twenty-year amortizing commercial mortgage with principal and interest due. On April 21, 2010, without notice to or authority from Mr. Saltzman, TD Bank withdrew $813.03 from his account to cover part of the interest due on the construction loan. On May 11, 2010, the bank withdrew $6,666.67 from the account to cover May's interest on the loan, also without notice or authority from Mr. Saltzman. On June 1, 2010, the bank withdrew $6,888.89 from the account to cover June's interest. On June 15, 2010, Mr. Saltzman wrote a check for $80,000 made payable to his account at Bank of America. TD Bank did not honor the check and notified Bank of America that the check had been written on a closed account. When Mr. Saltzman contacted TD Bank to ask why it would not honor a check from an account with over $81K, Customer Service Representative Brian responded that the account had been "frozen."

On June 16, 2010, TD Bank notified Mr. Saltzman that it would no longer take payments from his account, but that the principal and interest payment of $14,777.60 was due on July 1, 2010. On July 6, 2010, despite having more than $80K in a frozen account, TD Bank sent a notice of default for nonpayment to the Saltzmans, giving them ten days to cure.

The Saltzmans filed an amended complaint alleging three counts: fraud in the inducement, breach of contract, and conversion. They seek preliminary and permanent injunctive relief enjoining the defendant to release the funds in the TD Bank account and to refrain the defendant from taking any further steps to hold the plaintiffs in default of the loan. They also seek attorneys fees, costs, and punitive damages, claiming that TD Bank's actions were willful, malicious, and done with reckless disregard of the plaintiffs' rights.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim. Conley, 355 U.S. at 47. Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice

of the plaintiff's claim and the grounds upon which it rests. Id. The "complaint must allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564. Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995). The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

### III. DISCUSSION

In its motion to dismiss, the defendant claims that: (1) the fraud in the inducement claim is barred, as a matter of law, by the parol evidence rule and the economic loss doctrine because the plaintiffs are asserting a claim for nonperformance of terms expressly governed by the written, fully integrated loan documents; (2) the breach of contract claim lacks sufficient factual allegations to show a breach of any duty in the loan documents; and (3) the conversion claim is barred as a matter of law by the gist of the action doctrine.

**A. Fraud In the Inducement – Count I**

The elements of a fraud in the inducement claim are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its

8

falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. <u>Bortz v. Noon</u>, 729 A.2d 555, 560 (Pa. 1999). Here, the amended complaint paints a picture of an unsophisticated retiree[5] who, in his naivete, trusted the fraudulent representations of an immense corporation, and in essence, was duped. It alleges that the defendant knew that the original appraisal was accurate yet requested a second appraisal to manipulate the figures and cause the property to be overvalued. The defendant allegedly used comparables it knew were inappropriate just to get the construction loan approved, and knew that Mr. Saltzman would rely on its advice and sign the contract. Because Mr. Saltzman did rely on the representations of the defendant, he signed the contract and has suffered financially from the inability to obtain the types of rental income the defendant represented. Accordingly, the amended complaint has sufficiently stated enough factual matter, taken as true, to raise a reasonable expectation that discovery will reveal evidence of the necessary elements for a claim of fraud in the inducement.

Nevertheless, the defendant argues that the Saltzmans' fraud in the inducement claim is barred by the parol evidence rule because the Construction Loan Agreement is a fully-integrated agreement. Once a writing is determined to be the parties' entire

---

[5] Far from unsophisticated, Mr. Saltzman was a practicing attorney in this Commonwealth for many years before leaving his practice in 1999 to begin a bridal dress business in Florida.

9

contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425, 436-437 (Pa. 2004)). For example, while parol evidence may be introduced based on a party's claim that there was a fraud in the *execution* of the contract, i.e., that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the *inducement* of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract. <u>Id.</u> at 437 n. 26. The Third Circuit has stated:

> The Supreme Court of Pennsylvania found that the parol evidence rule barred consideration of prior representations concerning matters covered in the written contract, even those alleged to have been made fraudulently, unless the representations were fraudulently omitted from the contract. Otherwise, the parol evidence rule "would become a mockery," and integrated contracts could be avoided or modified by claims of differing prior representations.

<u>Dayhoff Inc. v. H.J. Heinz Co.</u>, 86 F.3d 1287, 1300 (3d Cir. 1996) (quoting <u>HCB Contractors v. Liberty Place Hotel Assocs.</u>, 652 A.2d 1278 (Pa. 1995).

In this case, Section 6.12 of the Construction Loan Agreement explicitly provides that: "[t]his Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements or statements relating to such subject matter." <u>See</u> Document #9-1 at 24.

Thus, at the time of execution, the parties agreed that they had entered into a fully-integrated agreement that superseded any prior "misrepresentations."

The plaintiffs vehemently challenge the defendant's contention, and argue that the defendant has misapprehended the nature of the claim and/or the application of Pennsylvania law to the claim. They explain that the parol evidence rule is not applicable here because the defendant's fraudulent representations did not concern matters covered in the written contract. The plaintiffs insist that their claim does not arise as a result of TD Bank's failure to perform under the loan agreements, but as a result of its causing the second appraisal to be conducted, then manipulating it to "fit the loan," by providing false and over-inflated values to the appraiser.

A careful reading of the relevant terms of the Construction Loan Agreement belies the plaintiffs' assertion. In fact, the documents expressly addressed performance regarding appraisals, requiring TD Bank to obtain another appraisal as a condition precedent to the initial advance of funding. Article III, Section 3.01(d)(iv) of the Construction Loan Agreement required TD Bank to have received and approved of:

> An independent M.A.I. appraisal of the Premises and Improvements complying in all respects with the standards for real estate appraisals established pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended from time to time, and, if required by Lender, a market feasibility study.

See Document #9-1 at 10. Thus, rather than being extraneous to the terms of the Construction Loan Agreement as the plaintiffs contend, TD Bank's obtaining an appraisal

11

was an express requirement of the fully-integrated agreement. Accordingly, the parol evidence rule bars consideration of the defendant's prior representations concerning matters covered in the written contract. Because the parol evidence rule is fatal to the first count of the amended complaint, I will grant the defendant's motion as to Count I, and dismiss it without addressing the defendant's other arguments.

### B. Conversion – Count III

In their conversion claim, the Saltzmans allege that TD Bank had no right to restrict the funds in their account or to refuse to release the funds to the plaintiffs. They further contend that TD Bank forced them into default so that TD Bank could confiscate the entire balance of the account and declare other remedies including confession of judgment for more than $2M. See Am. Compl. ¶¶ 82, 83. The defendant argues that because the plaintiffs' conversion claim duplicates a contractual claim, the third count of the amended complaint should be barred by the gist of the action doctrine.[6] I must agree.

Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel[7] or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification. Pittsburgh Construction Company v.

---

[6] The Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine. However, both the Court of Appeals for the Third Circuit and the Pennsylvania Superior Court have predicted it would do so. See Williams v. Hilton Group PLC, 93 Fed. Appx. 384 (3d Cir. 2004), and eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. 2002).

[7] Money may be the subject of conversion. Francis J. Bernhardt, III, P.C. v. Needleman, 705 A.2d 875, 878 (Pa. Super. 1997).

Paul Griffith and Saundra Griffith, 834 A.2d 572, 581 (Pa. Super. 2003) (citing Chrysler Credit Corporation v. Smith, 643 A.2d 1098, 1100 (Pa. Super. 1994)). A plaintiff has a cause of action in conversion if he had actual or constructive possession of a chattel at the time of the alleged conversion. Id.

The gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims. As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002). The distinction has been explained as follows:

> Although they derive from a common origin, distinct differences between civil actions for tort and contractual breach have been developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals. To permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

Id. In general, Pennsylvania courts are cautious about permitting tort recovery based on contractual breaches. Id. In some circumstances, it is possible that a breach of contract may give rise to an actionable tort. To be construed as in tort, however, the wrong ascribed to the defendant must be the gist of the action, the contract being collateral. Id. Where tort claims are "inextricably intertwined" with the contract claims, the gist of the action is contractual, and the tort claims should be dismissed. Id. at 21. The gist of the

13

action doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. 2005).

The gist of the action test requires the court "to focus on the substance of the dispute, or, more colloquially, to ask the question, 'What's this case really about?'" Pediatrix Screening, Inc. v. TeleChem Int'l, Inc., 602 F.3d 541, 550 (3d Cir. 2010). The doctrine deals less with specific enumerated "duties" than with the parties' conduct as it relates to the contract and the tort alleged. Id. Here, the Saltzmans allege that TD Bank improperly froze their account which, at the time, contained funds of over $80,000. The account in question began as a $90,000 deposit that the Saltzmans were required to make at time of the loan closing under Section 7.05(E) of the Construction Loan Agreement.[8] The funds in the frozen account were pledged to be maintained as a debt reserve. This obligation was defined by the terms of the contract and not by a larger social policy embodied by the law of torts. The conversion claim is thus "inextricably intertwined" with the contract claim. As such, the plaintiffs' claim that the defendant improperly froze the account is a contractual matter, and more properly construed as a claim for breach of

---

[8] Section 7.05(E) of the Construction Loan Agreement provides: The Borrower shall meet a pre-leasing requirement of 65% before construction begins or, in the alternative, maintain a debt reserve of six months ($90,000) to be deposited with Lender at or before Closing. See Document #9-1 at 28.

contract. Accordingly, I will grant the defendant's motion to dismiss Count III.

**C. Breach of Contract – Count II**

In Count II of the amended complaint, the Saltzmans allege that TD Bank "breached the terms of the contract." The defendant seeks its dismissal claiming that the plaintiffs have failed to plead sufficient factual allegations to show a breach of any duty in the loan documents. I disagree.

To proceed, the Saltzmans' amended complaint "must satisfy . . . the simple requirements of Rule 8(a)."[9] Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002). Following the Supreme Court's decision in Twombly, Rule 8(a) now requires that the facts in a complaint plausibly suggest that the pleader is entitled to relief. Wilkerson v. New Media Tech. Charter Sch., 522 F.3d 315, 321 (3d Cir. 2008). Accordingly, to state a claim, the Saltzmans must state enough factual matter, taken as true, to suggest the required element, which does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

In Pennsylvania, the elements of a claim for breach of contract include: (1) the

---

[9] Rule 8(a) of the Federal Rules of Civil Procedure provides that a "pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."

existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. Omicron Sys. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004).

As the defendant argued in its motion to dismiss Counts I and III, the plaintiffs' claims of fraud in the inducement and conversion are more properly construed as contractual matters rather than as torts. In fact, the parol evidence rule barred consideration of the fraudulent inducement claim because the defendant's alleged misconduct was not extraneous to the fully-integrated contract, but stemmed from one of its express terms. The Saltzmans are dissatisfied with TD Bank's performance in acquiring a second appraisal, a condition precedent to the Construction Loan Agreement. Thus, when the Saltzmans argue that TD Bank somehow interfered with the appraisal process, they are essentially alleging that TD Bank breached its contractual duty to obtain an independent appraisal. Accordingly, the facts pled to support the fraud in the inducement claim are also sufficient to support the breach of contract claim.

Likewise, the Saltzmans allege that TD Bank should not have frozen the Deposit Account which held over $80,000. Yet, as the defendant argued, maintaining a debt reserve account was an express term in the Construction Loan Agreement. Furthermore, the Construction Loan Note, executed simultaneously with the Construction Loan Agreement, provides:

> Borrower agrees to maintain sufficient funds in the Deposit
> Account to satisfy the payment due Lender under the Note on

> each Charge Date during the term of the Loan. If sufficient
> funds are not available in the Deposit Account on any Charge
> Date to pay the amounts then due and payable under this
> Note, Lender, in its sole discretion, is authorized to: (a)
> charge the Deposit Account for such lesser amount as shall
> then be available; and/or (b) charge the Deposit Account on
> such later date or dates after the applicable charge Date that
> funds shall be available in the Deposit Account to satisfy the
> payment then due (or balance of such payment then due).

See Document #9-2 at 4. Thus, if the Saltzmans claim that TD Bank improperly handled their account the terms of which are set out in the executed documents, the claim is one of a breach of contact. Because the amended complaint contains enough factual matter which, taken as true, raises a reasonable expectation that discovery could reveal sufficient evidence to show a breach of contract, I will permit the claim to proceed. Accordingly, I will deny the defendant's motion to dismiss Count II.

**D. Punitive Damages**

The Saltzmans seek punitive damages as allowable by law, claiming that the defendant's actions were willful, malicious, and done with reckless disregard for the rights of plaintiffs. See Am. Compl. ¶¶ 86, 88. "Punitive damages are, by definition, penal in nature and not for the purpose of providing additional compensation." Hart v. O'Malley, 781 A.2d 1211, 1217 (Pa. Super. 2001). They are only appropriate where "the actor's conduct was malicious, willful, oppressive, or exhibited reckless indifference to the rights of others." Id. Thus, Pennsylvania courts will only award punitive damages to punish a defendant for "outrageous conduct," which is defined as an act which, in

17

addition to creating actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiff's rights. Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 235 (3d Cir. 1997); Snead v. Society for Prevention of Cruelty to Animals, 929 A.2d 1169, 1184 (Pa. Super. 2007)).

I must agree with the defendant that the plaintiffs have failed to allege any facts supporting the notion that it acted in an "outrageous" fashion with a willful disregard for the plaintiffs' rights. At its core, the agreement between the Saltzmans and TD Bank appears to have been an average commercial loan transaction. While there are allegations of inappropriate behavior, nothing alleged in the amended complaint supports a finding of outrageous conduct on the defendant's part. Accordingly, I will grant the defendant's motion to dismiss the plaintiffs' claim for punitive damages.

An appropriate Order follows.