IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JON MICHAEL SALTZMAN, et al., | : | CIVIL ACTION |
| **Plaintiffs,** | : | |
| | : | |
| vs. | : | NO. 10-3265 |
| | : | |
| TD BANK, N.A., | : | |
| **Defendant** | : | |

# M E M O R A N D U M

**STENGEL, J.**                                      **March 13, 2012**

In this diversity case, a Florida couple filed a second amended complaint against their mortgage lender alleging two counts of breach of contract.  The lender has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In response, the plaintiffs filed a cross-motion for summary judgment.  For the following reasons, I will grant the defendant's motion, deny the plaintiffs' motion, and enter judgment in favor of the defendant and against the plaintiffs.

# I.  BACKGROUND[1]

For many years, Jon Saltzman was a divorce attorney in Allentown and his wife Robin ran a local wedding dress shop.  In 1994, the Saltzmans purchased a parcel of commercial real estate in Upper Macungie Township, Lehigh County.[2]  The property

---

[1] The majority of facts are taken from the defendant's statement of undisputed facts (Document #61-1), and the plaintiffs' statement of uncontested facts (Document #64-1).  The remaining facts are cited to the record where necessary.

[2] The Saltzmans owned the property free and clear of any debt, and valuations prepared by reliable third parties reflected a value of $750,000 as a result of the site improvements and governmental approvals made by the Saltzmans since acquiring the property in 1994.  See Second Am. Compl. ¶ 17.

included various commercial buildings, one of which was used as the dress shop.  A few years later, Mr. Saltzman gave up the practice of law, and the couple moved to Florida to pursue selling wedding dresses there.  The couple rarely returned to Pennsylvania.  Although business people and knowledgeable in the law generally, neither had any experience with real estate development.

In 2006, the Saltzmans began exploring the potential development of the property and retained the engineering firm of Martin, Bradbury & Griffith to prepare plans for a small retail strip center.  The plans called for the demolition of the existing buildings on the site and the construction of the retail center containing nine commercial units for rent.  In September 2007, the Saltzmans retained NAI Summit, a commercial realtor, to advise them on marketing the property.  Frank Smith, an equity owner of NAI Summit, began working closely with the Saltzmans advising on the development and use of the property.  NAI Summit appointed licensed realtor Jody King to serve as the professional responsible for guiding the Saltzmans through the process.  Miss King told Mr. Saltzman that she was seeking tenants and looking into financing for the project.  Mr. Saltzman indicated that he was satisfied with Wachovia Bank with whom he had done business for over twenty-five years.  He had discussed the project with individuals at Wachovia who showed a significant interest to move forward.  Miss King, however, told Mr. Saltzman that she had a close relationship with Stephen Patterson, a banking professional at TD Bank, formerly known as Commerce Bank, and that TD Bank was aggressively seeking customers.  She indicated that TD Bank could offer a better loan package than any other

competitor.  Mr. Patterson was the Regional Vice President of TD Bank, and had the largest portfolio of loans for the bank in that area.

In early 2008, the Saltzmans were meeting with potential builders to obtain construction estimates for the project.  Initial estimates were $135 per square foot.  In April 2008, Mr. Patterson advised the Saltzmans that TD Bank could offer a commercial one-year loan for $1.5 million, with no payments due during that year.  TD Bank required a payment of $5,000 for investigatory purposes.  Mr. Patterson indicated that he was confident the loan would be approved, and informed the Saltzmans that certain loan-to-value ratios[3] had to be satisfied to have the commercial loan approved.

On May 23, 2008, Mr. Patterson submitted a request for appraisal bids for the property to TD Bank's appraisal department in accordance with TD Bank's standard operating procedures.  Within a week, the appraisal department provided Mr. Patterson with three blind-bids reflecting dollar amount and turnaround time for an appraisal of the property.  Mr. Patterson shared the bids with Mr. Saltzman who elected to proceed with the lowest bid price proposal.  Days later, Mr. Patterson learned that the successful bidder for the appraisal was Laudone & Associates, Inc.  Anthony Bezich, Appraisal Administrator for TD Bank, sent a letter to Laudone authorizing it to perform the

---

[3]  Loan-to value ratio is defined as the ratio of the amount of a potential mortgage to the value of the property it is intended to finance, expressed as a percentage.  It is used as a way to assess the risk of making a particular mortgage loan.  A lower loan-to-value ratio is seen as a lower risk to the lender. See http://financial-dictionary.thefreedictionary.com/loan-to-value+ratio.

appraisal.  <u>See</u> Pl. Exhibit 25.  Mr. Patterson insists that he had no supervisory authority over Laudone.  <u>See</u> Exhibit 2, ¶ 10.

Laudone submitted its original appraisal dated June 13, 2008 to the Bank, valuing the property "As Per Complete" at $2.24 million.  <u>See</u> Exhibit 4.  After TD Bank's real estate appraisal group obtained the appraisal, TD Bank advised the Saltzmans that the appraisal indicated that the loan-to-value ratio was too low for the financing to be approved by TD Bank.  In July 2008, Laudone submitted an updated appraisal requested by the real estate appraisal group.  That appraisal indicated new values that satisfied TD Bank's loan-to-value ratios for approving financing in the amount of $2 million.

On August 29, 2008, the day of the loan's closing, TD Bank agreed to lend the Saltzmans $2 million for the construction of the retail center.  The agreement was memorialized by three executed documents:  (1) a Construction Loan Agreement; (2) a Construction Loan Note;[2] and (3) an Open End Mortgage and Security Agreement.  At the same time, the Saltzmans were required to deposit $90,000, a debt reserve of six months, into an account with TD Bank.

Construction on the project began shortly after the closing on the loan.  By April 2009, the Saltzmans had obtained one tenant at a rate of $21.00 per square foot and had rejected several other tenant offers in the $15.00 - $16.00 per square foot range.  By November 2009, well over a year after the loan closed, construction at the property was still not complete despite an initial ninety-day extension of the interest-only period.  The

---

[2] This loan note was considered an "interim loan" to be rolled over into the Open End Mortgage Agreement at the completion of construction.

Saltzmans requested a second extension on the interest-only payment terms from TD

Bank, and TD Bank agreed to extend those terms for six months conditioned upon the

Saltzmans paying a fee of $10,000.  This agreement was memorialized by a Second

Amendment to the Construction Loan Note Agreement signed by the parties.  By early

2010, the property still only had one tenant and the Saltzmans requested an additional

extension period of the interest-only payment option.  TD Bank did not grant such an

extension.

On May 11, 2010, TD Bank notified the Saltzmans that there were not enough

funds in their debt reserve account to satisfy the monthly interest charges on the loan.

The notice also showed that there was a hold on the $95,375.46 balance in the debt

reserve account.  On June 1, 2010, the Construction Loan Agreement converted to an

amortizing commercial mortgage, as required by the loan documents, with the first

principal and interest payment being due on July 1, 2010.  Two weeks later, Mr.

Saltzman tried to withdraw all of the funds from the debt reserve account by writing a

check to himself for $80,000, which represented the entire balance of the debt reserve

account as of that date.  The check was denied due to insufficient funds because of the

hold on the debt reserve account.  The following day, TD Bank notified the Saltzmans

that it would no longer use the debt reserve account to satisfy the principal and interest

payments due on the loan, and reminded them of the upcoming July 1st due date.  See

Exhibit 15.  The Saltzmans have not made a single payment on the loan since June 2010.

On July 6, 2010, the Saltzmans were put on notice of their default under the loan

documents.  On May 31, 2011, TD Bank filed a counterclaim in confession of judgment

for the Saltzmans' failure to repay the $2 million loan.  A week later, this court entered

judgment by confession against the Saltzmans in the amount of $2,170,040.10.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a).  A factual dispute is "material" only if it might affect

the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

A party seeking summary judgment initially bears responsibility for

informing the court of the basis for its motion and identifying those portions of the

record that it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party opposing summary

judgment "cannot rest on mere pleadings or allegations; rather it must point to

actual evidence in the record on which a jury could decide an issue of fact its way."

El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).  A party asserting that a fact

cannot be or is genuinely disputed must support the assertion by citing relevant

portions of the record, including depositions, documents, affidavits, or

declarations, or showing that the materials cited do not establish the absence or

presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  FED. R. CIV. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

## III.  DISCUSSION

The Saltzmans filed a second amended complaint alleging two counts of breach of contract against TD Bank.  See Document #39.  To prevail, a breach of contract claim under Pennsylvania law requires a plaintiff to establish three elements:  (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999).  As a general matter, the fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties.  Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001).  The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. Id. (citing Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982).  The whole instrument must be taken together in arriving at contractual intent.  Id.  Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were

ignorant of the meaning of the language they employed.  When a writing is clear and

unequivocal, its meaning must be determined by its contents alone.  <u>Crawford Cent. Sch.</u>

<u>Dist. v. Commonwealth</u>, 888 A.2d 616, 623 (Pa. 2005).

## A.  Count I – Breach of Contract (Independent Appraisal)

In Count I, the Saltzmans allege that TD Bank caused a second appraisal to be

conducted when it should have known that the original appraisal was accurate.  <u>See</u> Second

Am. Compl. ¶ 72.  In fact, they allege that the defendant caused the second appraisal to be

inflated even though it knew the appraisal would reflect an inaccurate valuation of the

property and rental value of the project.  <u>Id.</u> at ¶ 74.  Finally, the Saltzmans contend that TD

Bank should have reasonably known that they would rely on the second appraisal and move

forward with the project when they would not have done so based on the original appraisal.

<u>Id.</u> at ¶ 75.  The Saltzmans insist that these allegations support their claim that TD Bank

breached the terms of the Construction Loan Agreement by failing to obtain an independent

appraisal.  <u>Id.</u> at ¶ 76.

After careful review of the record, I must agree with the defendant that the

plaintiffs have failed to produce any evidence to show that TD Bank acted improperly

during the appraisal process or interfered with the independence of the appraisals for this

project.

Laudone submitted its original appraisal dated June 13, 2008 to the Bank, valuing

the property "As Per Complete" at $2.24 million.  <u>See</u> Exhibit 4.  When Mr. Bezich of

TD Bank's appraisal department learned of the property's appraised value, he notified

Mr. Patterson.  See Pl. Exhibit 26.  Mr. Patterson responded immediately that the quoted

figure would cause problems for the loan, and that he was interested to see what the

appraiser used as a hard cost basis.  See Pl. Exhibit 27.  The quoted amount did not

provide the value needed under the loan-to-value ratios to justify the $2 million loan for

the project.  Mr. Bezich responded that he would forward a copy of the appraisal to Mr.

Patterson, and then forward to the appraiser any concerns Mr. Patterson might have.  See

Pl. Exhibit 28.

Upon review of the appraisal, it became apparent to all concerned, however, that

the appraisal was based on inaccurate costs.  For example, because Laudone initially

worked under the assumption that the project was being built as shell space with the

tenants covering the costs for the fit-out, it erroneously relied on a construction cost

estimate of approximately $1.5 million for the project.  It was the Saltzmans' intention to

build a fully fit-out center which would have increased the construction costs to

anywhere from $1.9 million to $2.2 million.

On July 8, 2008, Mr. Saltzman e-mailed Bryan Ritter, the engineer on the project:

> Please remember two points when you talk to the appraiser tomorrow:
>
> 1.  He had the wrong bid from Miller as the bid he used was for a shell only.  Please email him the Miller bid for the entire project.

2. The best comparable would be the Shoppes at Caramoor which are just down the street and are renting for $24 to $28 a square foot.

With the appraisal as it now stands we will not be able to proceed as he has valued it for almost a million less than it will cost to build.

See Def. Exhibit 25.  The next morning, Mr. Saltzman again e-mailed Mr. Ritter:

Bryan, were you able to reach the appraiser?  The project is totally dead in the water and I am hoping you can reach him to fix his mistakes.

See Def. Exhibit 26.  On July 9, 2008, Mr. Ritter e-mailed Mr. Henn, the appraiser, to

express "grave" concerns about the information relied on in the initial appraisal:

Mike,
Having reviewed the appraisal for the above captioned project with Jon Saltzman, I have found some items that are of a grave concern. Specifically, the use of the Miller, Miller, McLaughlin shell bid price of $1,555,547 as shown on his correspondence of 25 June 2008. Previous to this they had submitted a revised bid of $2,086,097.00 for the shell and tenant fit-out items that would be the responsibility of Jon Saltzman as noted in their correspondence of 24 June 2008.

Their initial bid was $2,218,936.00 as noted in their bid of 11 June 2008. The low price for the project as submitted by CM Wells for the shell and tenant fit-out items is $1,977,616.00 with deducts as noted in their correspondence of 24 June 2008 for revised floor plans of tenant layouts.  Furthermore, using rental rates of $14.00 per square foot is too low when comparing it to Village of Caramoor, a newer shopping center opening in 2006 on Route 100 south of this proposed center in Lower Macungie Township near the Borough of Macungie which leases for $24.00 to $28.00.  The proposed center mimics that center for which I am familiar with as we designed

10

both and work with the owner of that center with several
of his facilities throughout Pennsylvania.

See Exhibit 5.

A revised appraisal was subsequently ordered to address the issues raised by Mr.

Patterson and Mr. Ritter.  On July 11, 2008, Mr. Saltzman e-mailed Mr. Patterson to

complain about the comparables that had been used in the initial appraisal, to advise that

the construction quotes were about to expire, to complain about Mr. Henn's

"incompetence," and to implore TD Bank to remove Laudone from their list of approved

appraisers:

> Dear Mr. Patterson,
> I have been advised by Bryan Ritter of Jena Engineering
> that the appraiser is amending/revising his appraisal.  Jody
> King told me that this appraiser has torpedoed one other
> project of theirs and that she was astounded that the
> appraiser did not use the most relevant comparables like
> Caramoor which was built in 2006 and the one in Iron
> Run that was just completed. Both of these are within
> minutes of my project with far higher rents. Ms. King also
> indicated his land value comparables were way off and
> that the appraiser didn't seem to have a current or
> complete database as would be expected.  I sure hope your
> bank removes him from your approved list.
>
> I have no idea as to when the amended appraisal is due (or
> why the original was delivered well beyond the original
> promised date) but I have been informed by the builder
> that the quotes will expire soon and the building and
> material prices are expected to increase. Obviously I am
> extremely frustrated as it now appears that my project will
> not be able to go forward due to the incompetence of this
> appraiser.

See Exhibit 7.

On July 21, 2008, Mr. Saltzman wrote directly to Mr. Henn to confirm that

Laudone was using the costs estimates associated with a fully fit-out tenant space as

opposed to a shell-space in the revised appraisal:

> Mr. Henn,
> I just wanted to touch base with you to make sure you had everything you need for the amendment/update to your appraisal. Specifically, it is my understanding that you will be receiving a new package of comps by tomorrow. Additionally, I wanted to make sure that Bryan Ritter from Jena had provided you with ALL the building cost bids. I know that you had inadvertently used the 1.5 [million] "shell only" bid from Miller when in fact Millers complete bid (with HVAC, etc.) was almost 2.1 million and the lowest bid was from CM Wells at just under 1.9 million.

See Exhibit 8.  Further, in an e-mail to TD Bank on July 16, 2008, Mr. Henn confirmed

that an increase in the projected costs of the project would increase the value reflected in

the appraisal:

> Hi Anthony,
> After reviewing the letter from Steve Patterson, we believe we have found the difference between the appraised value and some of Steve's concerns. Within the appraisal we valued the property "As per complete" of the improvements to be completed by the owner. The cost estimates provided to us by the owner, were $1.555 M. These estimates are for a finished shall space with the tenants completed [sic] the fit out. As a result our "As Per Complete" analysis, reflect the property in this level of finish. Here is how the different approaches would be affected:
> Sales Comparison Approach: An age and/or condition adjustment would be more reflective of the overall new fully finished building.

Income Approach: Lease rates would be higher with the landlord providing a turnkey space.

Cost Approach: Would be higher due to increased costs of a fully finished building. However, please be advised that the costs bids of $1.977 M to $2.219 M for a fully finished building are not supportable with the plans and specifications that we were provided with.

We will be happy to modify the report if your intention was for a fully finished building.

* * *

As a final note:  we did have some concerns about the appraised value being too low compared to the cost estimates.  We put a call into Anthony [Bezich] on July 2, 2008 and July 7, 2008.  He returned our call on July 8, 2008 and asked us to send the report "As Is."  Bryan Ritter contacted Mike Henn on July 9, with concerns on the appraisal.  We immediately addressed those concerns and talked to Anthony about revising the appraisal.

See Exhibit 20.  Shortly thereafter, Laudone submitted the updated appraisal which indicated new values that satisfied TD Bank's loan-to-value ratios for approving financing in the amount of $2 million.

Mr. Henn, one of the appraisers who performed both of the appraisals for this project, was deposed at length.  See Exhibit 19.  He unequivocally testified that no one from TD Bank had influenced him in his duties with the appraisals, either directly or indirectly.  There was no indication that Mr. Henn had deviated from his normal practice in preparing either appraisal.  Mr. Henn further testified that he considered the initial appraisal and the revised appraisal to be independent, and that no one at TD Bank exerted any influence on their outcome:

| Zullo: | During the appraisal process, did TD Bank or anyone at TD Bank direct you in how you should prepare the appraisal? |
|---|---|
| Henn: | No. |
| Q. | And during the appraisal process, did TD Bank or anyone at TD Bank tell you what value this property should have? |
| A. | No. |

See Henn Dep. at 183.

Mr. Henn even explained the basis for the difference in values between the initial appraisal and revised appraisal:

| Eidelman: | Okay.  Now, explain to me, if you would, assuming that you responded to Mr. Ritter's correspondence, how that difference as raised by Mr. Ritter, affected the difference in your values from the first to the second appraisal? |
|---|---|

* * *

| Henn: | At that point it didn't change the value.  I was reading the e-mail and talking to Laura about what these concerns were. |
|---|---|

* * *

| Q. | So the question is, how did the information provided by Mr. Ritter in this e-mail affect, if at all, your evaluations between the first and the second appraisal? |
|---|---|
| A. | Are you talking about this specific moment in time when we got the e-mail? |
| Q. | No. |
| A. | We examined the information he gave us and made our opinion on value. |
| Q. | I understand. I'm asking you to explain to me how this information provided in -- you did a second appraisal, correct? |

14

A.          Yes.

Q.          Why did you do a second appraisal?

A.          Because we had different parameters.

Q.          What were the different parameters?

A.          It was a different fit-out for the building than what was
            originally stated to us.

Q.          Is that –

A.          This went into it, yes.

Q.          Let me ask my question.  Is the difference what is stated
            by Mr. Ritter in this e-mail, Exhibit No. 24?

A.          Um-huh.

Q.          And is that the only difference?

A.          No, no.

Q.          What I'm saying to you, Mr. Ritter wrote an e-mail to
            you the day after you completed your appraisal?

A.          Assignment, yes.

Q.          Okay. And he brought something to your attention –

A.          Um-huh.

Q.          -- about the construction of the project. And based on that,
            in part, you changed your evaluation of the project?

A.          Later on, yes.

See Henn Dep. at 130-133.

Mr. Henn's testimony is corroborated by the evidence in the record.  The initial appraisal specifies that the valuation conclusion of the appraisal was based on total costs estimates of $1,555,547 "to complete the shell of the Saltzman Shopping Project."  See Exhibit 4 at 34.  Comparatively, the revised appraisal specifies that the valuation conclusion of the revised appraisal was based on several cost estimates for the project ranging from $1,977,161 to $2,218,936, while noting that the initial appraisal was based on an estimate for "only the shell fit-out."  See Exhibit 6 at 36.  The revised appraisal further elaborated that, "[w]e are doing the appraisal as if the owner is completing all of the fit-out."  Id.

What is very persuasive, however, is the inability of the plaintiffs to express any support for their claim that the defendant interfered with the independence of the appraisals in order to inflate falsely the value of the property.  During their depositions, the plaintiffs were asked to specify the facts supporting their claims of breach of contract. Mrs. Saltzman testified that she had no knowledge of the facts surrounding the case, and that her husband did not keep her informed of the details.  See Robin Saltzman Dep. at 9-10.  Mr. Saltzman confirmed this in his own deposition.  See Jon Saltzman Dep., Pt. II at 89.

During his deposition, Mr. Saltzman was similarly unable to specify any facts supporting his allegation that TD Bank had interfered with the revised appraisal:

Bono:          Why do you say that the appraiser was not independent?

Saltzman:      Because I've had discussions with my attorney and

that's the conclusion we came to.

Q.      Well, you brought a claim in court.  What credible evidence do you have that the appraiser was not independent?

A.      All the things that [were] pointed out to me in discussions with my lawyer.

Q.      Well, tell me one document that you have that you're aware of as evidence that supports your claim that the appraiser was not independent?

A.      A document?  I've seen a lot of documents, but all – when my attorney reviewed things, he showed me what he had researched and handed me.

Q.      Other than talks to your attorney, do you have any credible evidence at all?

A.      You mean other than supplied to me by my attorney?

Q.      Right.  What evidence do you have to support your case? You made the claim.  What's the evidence?

A.      There was a lot of evidence that he showed me that supports my claim.

Q.      So you're not aware of any evidence independent of what your lawyer showed you?

A.      None independent from what I've discussed with him and what has been showed to me by him.

                              * * *
Q.      Tell me one document, one, that you have that shows the appraiser was not independent.

A.      In documents -- all the documents I've seen that my attorney has are documents he produced and showed me through the research.

17

* * *

Q.        What facts support your claims about lack of
          independence for the appraiser?

A.        The bank's involvement.

Q.        What does that mean?

A.        Mr. Patterson's, basically, playing orchestra
          leader with the appraisal all the way through.

Q.        What does that mean?

A.        That I don't understand your question.  What does
          that mean?

Q.        I want to know what the facts are that support
          your claim that the appraiser was not independent.
          You said the bank was involved. What else other
          than the bank being involved?

A.        Everything else that I think is a legal basis.

Q.        What does that mean, is a legal basis?  I'm asking for
          facts that you know about that support your claim.

A.        Other than literally within a minute or two of the bank
          being told what the numbers were that the banker was
          able -- it seemed within a very short period of time.
          A minute or two is an exaggeration -- that the banker was
          able to tell me that they were going to have him revise it?

Q.        I'm not here to answer your questions.  You know that,
          Mr. Saltzman.  I'm asking you what are the facts that
          you are aware of as a plaintiff who sued TD Bank for
          having an appraisal done that was not independent?
          What are the facts?

A.        I have no other facts other than what I've already explained.

See Exhibit 18 at 32-35.

Given Mr. Saltzman's education and sophistication in the business world, it is curious that he was unable to identify during his deposition any evidence to support his claims.  Nevertheless, the evidence does establish that Mr. Henn performed the initial appraisal under the assumption that the Saltzmans would be providing tenants with shell space for rent, and that he was advised by Mr. Ritter, the Saltzmans' engineer, that that assumption was incorrect.  Mr. Henn indicated that such a change in assumptions would increase the appraised value of the property.  The evidence also confirms that Mr. Saltzman contacted Mr. Henn to ensure that Laudone would be using updated information for the revised appraisal.  Finally, the revised appraisal relied on the updated costs bids which increased the value of the property by approximately $500,000.

In addition, the record contains no evidence for a jury to find that TD Bank breached any agreement, interfered with the appraisal process, or directed Mr. Henn in the performance of his duties.  Any concerns Mr. Patterson had regarding the initial appraisal were echoed by both Mr. Ritter and Mr. Saltzman himself.  Mr. Saltzman was aware of the costing mistake in the initial appraisal, and anticipated that a correction of that mistake would increase the valuation of the property.  He continued to be an active participant in the entire process.

The plaintiffs also allege that the comparables used in the revised appraisal were not based in fact and were false in an effort to inflate the value of the property.  See Second Am. Compl. ¶ 33.  They allege that their current realtor, Dick Adams, told them that TD Bank and Miss King must have provided Laudone with inaccurate comparable

19

rental rate information for the second appraisal because the rental rates at nearby commercial strip projects had been in the $17.50 per square foot range in 2007 and 2008. Id. at ¶ 55; see also Adams Dep. at 13.  Again, the plaintiffs have not produced any evidence to support these bald allegations.  In fact, the record contradicts them.

Initially, I note that the record shows that Mr. Saltzman was well aware of the comparables even before they were provided to Laudone and was in full agreement with their utilization in the new appraisal.  Miss King sent a list of new comparables to Mr. Patterson and Mr. Saltzman.  See Exhibit 23.  The list included several shopping projects with rental rates between $20-$27 per square foot.  Id.  She informed Mr. Patterson and Mr. Saltzman that she would await their feedback before sending the list to the appraiser. Mr. Patterson responded that he was fine with the list being sent to the appraiser, but specifically asked Mr. Saltzman to respond about the list and about whether the appraiser was using the correct cost information.  Id.  Mr. Saltzman responded, "All fine with me." Id.  Mr. Patterson and Mr. Saltzman unequivocally approved sending the new list of comparables to Laudone.  Accordingly, between June 13, 2008 and July 29, 2008, Miss King and Mr. Ritter provided Laudone with the additional information to consider in performing the revised appraisal.

During her deposition, Miss King produced an e-mail dated July 15, 2008 and sent from Robin Handwerk-Marsik of the engineering firm on the project, to Mr. Henn.  The e-mail provided Mr. Henn with information showing that, as of July 2008, a commercial

strip project close to the plaintiffs' project was getting rental rates of $21-$22 per square

foot.  See Exhibit 21.  Mr. Saltzman is copied on the e-mail:

> Hi Mike,
> I double checked with the agent for Village of Caramoor,
> Dick Adams, to clarify the square foot rates.  When the
> rents began, they were at $21 per square foot which breaks
> down to $17.50 per square foot plus $3.50 CAM charge
> and the 3% annual increase was only on the square foot
> charge (not the CAM).  Now the rents are $22 per square
> foot with a breakdown of $18 per square foot plus $4
> CAM charge.  Should you need anything else relating to
> this matter, please let me know and I'll do my best to
> assist you.
>
> Have a nice day!

See Exhibit 21.

Mr. Adams testified that he did not sit down with Mr. Saltzman at the time of his

hiring and discuss the comparables used in the revised appraisal.  See Adams Dep. at 14.

In fact, Mr. Adams indicated that to the best of his knowledge, he did not indicate to Mr.

Saltzman that the revised appraisal used inappropriate or inaccurate comps.  Id. at 14, 83.

Mr. Adams also testified that he has been the listing broker for the Village at Caramoor

Shopping Center since its construction, and continues to be quite familiar with its rental

rates.  Id. at 16-17.  He confirmed that during the 2007-2008 time period, the rental rates

at the Village at Caramoor were $21 per square foot, which breaks down to $17.50 per

square foot, plus a $3.50 CAM charge used for the maintenance of central areas at the

Village.  Id. at 25.  Although he had no recollection of a conversation with Miss

Handwerk-Marsik, Mr. Adams nevertheless supported the rates found in her e-mail.  Id.

at 26.  Finally, Mr. Adams indicated that he had no evidence that TD Bank had interfered with the appraisal process.  <u>Id.</u> at 83.  Mr. Adams also testified that he never told Mr. Saltzman that TD Bank interfered with the appraisal process, or that the comparables used in the revised appraisal were inaccurate.  <u>Id.</u>

Miss King also testified that Mr. Saltzman directed her to get new comparables to Laudone to be used in the revised appraisal:

| Eidelman: | Do you recall any conversations with Mr. or Mrs. Saltzman concerning what the effect of the initial appraisal might be on a project at that time? |
|---|---|
| King: | The discussions that I had with regard to the appraisal were the problems that there were with it.  There were problems with costs that came from the engineers or the builders and there was a problem with the comps that were provided. So the long term aspect of that, the appraisal needed to be redone. That was what my focus was, that the appraisal was wrong and I needed to quickly get information to Mike Henn so that the appraisal could be redone and be accurate and a new one done. |
| Q: | But that was information that you had received from someone else, correct? |
| A: | It was the direction that I received from Jon, was to get more comps – and Steve Patterson, can I look at getting more comps. |

<u>See</u> King Dep. at 31-32.

Miss King also provided the background on the comparables used in the first appraisal, of which Mr. Saltzman was aware:

| Eidelman: | But do you have any recollection of any undertaking |
|---|---|

22

that you might have done with respect to you
determining whether there was any problem with
his original assessment in his appraisal?

King:        Yes. And what I remember is that the land comps
were very old.  Everything was old or – how can I
say this? The comps were not on the right side of
town that we had, and we had more accurate comps.
Mr. Saltzman had comps as well and we all provided comps.

Q:           So let's talk about what you remember being the
problem with the first comps.

A:           Okay.

Q:           They were on the wrong side –

A:           They were on the east side of town.

Q:           And you say east side of town, you mean
east side of Allentown?

A:           Bethlehem possibly. They weren't around
the subject matter.

Q:           So that's one. The second thing you remember about them?

A:           That the land comps were low.

Q:           Low as compared to what?

A:           Recent transactions.

See King Dep. at 34-35.

Thus, the evidence of record supports the finding that the comparables that were

provided to Laudone were accurate, and that Mr. Saltzman was given an opportunity to

review them before they were sent to Laudone.  In fact, Mr. Saltzman authorized Miss

King to send the comparables to Laudone.  There is no evidence in the record to support

the plaintiffs' allegations that the defendant provided the appraiser with false, inaccurate,

or inflated comparables to be utilized in the revised appraisal.

Finally, in the memorandum in support of their motion for summary judgment, the

Saltzmans now argue that TD Bank breached the contract by failing to comply with a

condition precedent to the loan, i.e., obtaining an M.A.I. appraisal.  A careful reading of the

Construction Loan Agreement belies this contention.

Section 3.01 of Article III of the Construction Loan Agreement provides that "the

***Lender shall not be obligated to make the initial advance until*** the following conditions

shall have been satisfied . . . (d) Lender or Lender's Counsel shall have received and

approved each of the following: . . . (iv) <u>Appraisal and Feasibility Study:</u>  An independent

M.A.I. appraisal of the Premises and Improvements complying in all respects with the

standards for real estate appraisals established pursuant to the Financial Institutions Reform,

Recovery, and Enforcement Act of 1989, as amended from time to time, and, if required by

Lender, a market feasibility study."  <u>See</u> Exhibit 9 at 9-10 (emphasis added).  The condition

precedent was included in the contract for the sole benefit of the Lender, i.e., TD Bank.  It

provided that TD Bank would not be *obligated* to make the initial advance until an

independent M.A.I. appraisal was submitted.  As the beneficiary of this contract term, TD

Bank must have been satisfied with the appraisal or it would not have made the initial

advance.  It is disingenuous for the plaintiffs to assert this claim at this stage of the litigation in an attempt to find potential breaches of the contract.

The plaintiffs also complain in their motion that Barbara Laudone, the M.A.I. appraiser at Laudone, was required to supervise anyone else working on the appraisal and to be the co-signer of the appraisal.  <u>See</u> Pl. Exhibit 25.  Because there is no indication that Mrs. Laudone performed these duties, the plaintiffs claim that the requirement of having an M.A.I. appraisal has been further breached.  A review of the bank's authorization letter sent to Mrs. Laudone also belies this contention.  Section IX of the authorization provides:

> The use of subcontractors is permitted, but you assume full responsibility for its contents and conclusions.  You must have professional control of such contractors, and you must be a co-signer of the report.

<u>Id.</u>  These appraisals, however, were not conducted by subcontractors, but by members of the Laudone firm, specifically Laura Laudone-Weiss and Michael Henn.  Accordingly, there was no contractual reason for Mrs. Laudone to have assumed professional control or to have been the co-signer of the appraisals.

### B.  Count II – Breach of Contract (Debt Reserve)

In Count II, the Saltzmans allege that TD Bank breached the terms of the contract by freezing their account and by refusing the use of funds to pay for mortgage payments.  <u>See</u> Second Am. Compl. ¶ 81.  They also allege that TD Bank did this in order to force the Saltzmans into default so that it could confiscate the entire amount in their account.  <u>Id.</u> ¶ 82.

The debt reserve account that the plaintiffs allege was improperly frozen is addressed in the terms of the executed loan documents under which the plaintiffs received the $2 million loan.  The Construction Loan Agreement specifically required the Saltzmans to "maintain a debt reserve of six months ($90,000) to be deposited with Lender at or before closing."  See Exhibit 9; see also Exhibit 2 at ¶ 34.  As the Saltzmans concede, Mr. Saltzman deposited the $90,000 with TD Bank at the time of closing.  See Second Am. Compl. ¶ 58.  In the Construction Loan Note, the Saltzmans specifically authorized TD Bank to charge the debt reserve account until the note was paid in full. See Exhibit 10; see also Exhibit 2 at ¶ 35.  They also agreed to "maintain sufficient funds in the deposit account to satisfy the payment due [TD Bank] under the note on each Charge Date during the term of the Loan."  See Exhibit 10; see also Exhibit 2 at ¶ 36.  TD Bank reserved the right, at its sole discretion, to discontinue charging the deposit account at any time, "in which event, Borrower shall thereafter be responsible for making all payments."  Id. at ¶ 37.  Finally, in the Mortgage and Security Agreement, which was also executed, the Saltzmans gave TD Bank a security interest in the "Mortgaged Property" and "Chattels."  Id. at ¶ 38.  These contract terms cover "Personal Property" which is defined as including "all bank accounts maintained by or on behalf of Mortgagor [Saltzmans] . . . and any other accounts established pursuant to any of the Loan Documents."  Id. at ¶ 39.  Mr. Saltzman admitted that he had read and understood all of these loan provisions before he executed the loan documents.  See Exhibit 18 at 88-99. Despite this knowledge, Mr. Saltzman also admitted that he attempted to withdraw all of

the money from the debt reserve account on June 15, 2010.  Id. at 129.  This breached the

Saltzmans' obligations under the contract to maintain a debt reserve of $90,000 and to

maintain a balance sufficient to satisfy the payment due under the note on each Charge

Date.

Further, Mr. Saltzman was aware that the debt reserve account had a hold on it as

early as May 11, 2010, at least a month before he attempted to withdraw the entire

balance of the debt reserve account from TD Bank.  See Jon Saltzman Dep., Pt. I at 130-

131.  In May 2010, the plaintiffs received a "Notice of Insufficient Funds" from TD

Bank, informing them that there were insufficient funds in the debt reserve account to

satisfy their monthly interest payments of $6,657.08.  See Exhibit 14.  The second page

of the notice indicates that there was a hold on the account for an amount of $95,375.46,

which resulted in the account's having insufficient funds.  Id.  Thus, the plaintiffs were

aware that there was a hold on the funds in the debt reserve account.  See Exhibit 18 at

130-131.  Despite this knowledge, Mr. Saltzman wrote a check for $80,000 from the debt

reserve account on June 15, 2010, and then alleged in his complaint that he was unaware

of any restrictions on the account:

> Bono:      Okay. You received written notification as well from
>            the bank there was a hold on the account, correct?
>
> Saltzman:  Never.  No.  I called the service department to find out
>            why they said it was a closed account, and that's when I
>            was told it was frozen.  I never received notification that
>            I recall.
>
> Q.         Well, why don't you take a look at Exhibit F to your

amended complaint, which is Exhibit No. 51.

Eidelman:     Just give me the document number.

Bono:         It's document No. 9-6.

A.            Okay.

Q.            Now, you knew that your account was frozen when
              you received that document, didn't you?

A.            Yes.  Because I had called.

Q.            And you also received a document telling you that too, right?

A.            This document doesn't say anywhere that it's frozen.

Q.            Well, look at page 2 under account balance, see where
              it says holds in capital letters, H-O-L-D-S?

A.            No, I don't.  Yes, I do see holds 95 -- yes, 95,375.46 –
              the word holds.

Q.            So you were given written notification that you had
              insufficient funds and there were holds on your
              account, on the money in your account? And you
              had verbal confirmation of that as well, correct?

A.            Correct.

Q.            And you still turned around and tried to write a check
              in June on that same account even though you knew
              there was a hold in writing and even though you got
              verbal confirmation from someone at TD Bank?

A.            Correct.

Q.            And that check you also attached to your complaint –
              amended complaint, which is Exhibit No. 51, that's
              attached as Exhibit H.

| | | |
|---|---|---|
| Bono: | And Ed, it's document 9-8. | |
| A. | I have the exhibit in front of me. | |
| Q. | This is a check you wrote on 06/15/2010, two months after you knew there was a hold on your account, correct? | |
| A. | Correct. | |

<u>See</u> Jon Saltzman Dep., Pt. II at 130-131.

The evidence of record shows that by placing a hold on the debt reserve account, TD Bank was exercising its rights expressly provided it in the loan documents.  Further, the plaintiffs have no basis to maintain that they were unaware of the hold on the debt reserve account when they wrote the check for the remaining balance on June 15, 2010.

In conclusion, the plaintiffs have not produced any evidence to support their bald allegations that TD Bank failed to obtain an independent appraisal in connection with providing them a $2 million construction loan.  Despite the vast evidence of record and the many depositions taken, the plaintiffs have been unable to uncover a single fact to support these allegations.  Likewise, the plaintiffs have not produced any credible evidence that TD Bank acted inappropriately with regard to the debt reserve account.  TD Bank's actions in placing a hold on the funds were consistent with the terms of the loan documents executed by the Saltzmans.  Accordingly, I will grant the defendant's motion in its entirety, deny the plaintiffs' cross-motion, and enter judgment on behalf of the defendant and against the plaintiffs.

An appropriate Order follows.